UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAMITA BRACEY,

                     Plaintiff,               Case Number 14-12155
                                               Honorable David M. Lawson

v.

MICHIGAN BELL TELEPHONE
COMPANY d/b/a AT&T, a Domestic
Profit Corporation,

                     Defendant.
_____/

## <u>OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT</u>

The plaintiff, who suffers from chronic ulcerative colitis and irritable bowel syndrome, sought an accommodation from her employer, defendant Michigan Bell Telephone Company, in the form of immediate access to a bathroom when her condition was in flare-up mode. The defendant refused, contending that the accommodation would interfere with some of the essential job functions of her position as a Consumer Product Specialist, whose duties included fielding calls from customers who wanted to cancel or reduce their service. Instead of reaching an accommodation with the plaintiff, the defendant fired her, and now moves for summary judgment on her claims brought under the Americans for Disabilities Act, 42 U.S.C. 12101, *et seq.* Because the plaintiff has brought forth evidence that demonstrates that she was qualified for her position with a reasonable accommodation, she has satisfied her burden of establishing material fact questions that require a trial to resolve. Therefore, the motion for summary judgment will be denied.

I.

Plaintiff Damita Bracey began working as a Consumer Product Specialist (CPS) for Michigan Bell on January 14, 2002. She worked at the Port Huron Call Center, sometimes called the "retention center." The primary purpose of the call center was to attempt to "retain" or "save" customers who called to cancel or reduce Michigan Bell services. Customer calls range anywhere from 30 seconds to 30 minutes in duration. The number of employees at the Port Huron Call Center varied, but it appears to have been between 130 to 180 employees from 2012 to the present.

According to Michigan Bell's job brief, a CPS is expected to sell products and services by handling incoming sales calls and participating in canvassing to sell products and services. The job brief states that "[r]easonable accommodations will be made for qualified candidates with disabilities. Essential job functions are identified for specific jobs on job requisition forms." No job requisition forms are provided by the parties. In a clarification request to a physician statement, the defendant described Ms. Bracey's job duties as "sitting, typing and talking."

The management structure at the Port Huron call center is unclear, but it appears to consist of a center director (Geoffrey Lee), a center sales manager (Sean "Brister" Dupree or Pearlanne Pollard), eight coach leaders (including Melanie Prentice), a force manager, and an attendance manager (Tracy Glenn). The eight coach leaders supervise and motivate 20 to 22 CPSs. There are also a small number of clerks, with the same employment level as a CPS, whose job it is to support the center internally, but who have no direct interaction with customers; their work is usually done offline.

CPSs are given two scheduled 15-minute breaks and one scheduled 30-minute lunch break per day. Occasionally, however, a CPS will need to use the restroom or need to take a break at an

unscheduled time.  When that happens, a CPS can take a "health break."  Each CPS has a yellow button that can be pressed at any time, even during a call, that will prevent the station from receiving new calls.  As Tracy Glenn explained, a CPS can be on a call, press the yellow button, finish the current call, take a break, and then return to the station; the system will account for the time the CPS was not at the station.  That action is considered closing the line and no special permission is required to use this feature.

Ms. Bracey suffers from chronic ulcerative colitis and irritable bowel syndrome (IBS).  She was first diagnosed with left-sided ulcerative colitis in 2004 during an evaluation for abdominal discomfort.  According to Kavita Tumma, M.D., one of the plaintiff's treating physicians, ulcerative colitis is an inflammatory condition of mucosal lining of the colon, which causes that inner lining to become red, swollen, and irritated, causing abdominal pain and bloody diarrhea.  The condition can remit and flare up over the course of a patient's lifetime.  Dr. Tumma described IBS as "a functional bowel disorder which involves the digestive system where a person can have multiple symptoms over a period of six months and basically involves abdominal pain most of the times associated with some change in bowel habits in the form of diarrhea, constipation or alternating diarrhea and constipation, urgency, bloating, belching, and sometimes nausea, vomiting."  Colitis and IBS have similar symptoms, but colitis can be in a flare-up mode, although IBS symptoms also wax and wane.

In 2007, Ms. Bracey began using intermittent FMLA leave when her colitis flared up, which seemed to work out for her.  From 2007 to 2012, she managed her condition without a request for an accommodation.  In February of 2012, Ms. Bracey requested a leave of absence to treat a colitis flare-up.  Michigan Bell's disability claims and requests for accommodations are administered by

a third-party vendor called Michigan Bell Integrated Disability Service Center (IDSC), administered by Sedgewick CMS.  Ms. Bracey's condition became such that IDSC approved a short-term disability leave of absence from March 3, 2012 to April 11, 2012.  And on March 21, 2012, Deborah Harries, a short-term disability specialist, received a clarification from Dr. Tumma stating Ms. Bracey's recommended restrictions were permanent.

On April 12, 2012, Ms. Bracey filed an application with the Social Security Administration for disability insurance benefits, citing her colitis and generalized anxiety disorder as impairments. In the Social Security proceedings, Ms. Bracey averred that she could not work because she had "to run to the bathroom 20 to 30 times a day, spending more time in the bathroom than out."  However, the ALJ did not find her testimony credible in light of her physicians' description of her ulcerative colitis as "mild," laboratory examinations describing her condition as "quiescent," and her own statements to her doctors describing her frequency of bowel movements per day at about one-third of what she told the administrative law judge.  One treating physician noted that Ms. Bracey complained of having ten bowel movements every 24 hours, including a few at night.  The ALJ denied Ms. Bracey's application because Ms. Bracey did not have a disability within the meaning of the Social Security Act and was able to work independently and on a sustained basis performing a full range of light work.

It appears that Ms. Bracey's colitis went into remission sometime around May of 2012, but her IBS persisted.  On May 3, 2012, Laura Page, a job accommodation specialist for Michigan Bell, sent an email to Melanie Prentice, a coach leader, inquiring whether Ms. Bracey could be accommodated with immediate access to the bathroom approximately 10-12 times a day for approximately 10-15 minutes at a time.  The accommodations were expected to be needed through

-4-

May 23, 2012 "after which [Ms. Bracey wa]s predicted to be full duty." The suggestion was not well received. Ms. Prentice forwarded the email to Tracy Glenn exclaiming, "Seriously????????????????????".

From September 20, 2012 to January 16, 2013, IDSC asked for at least six clarifications from Ms. Bracey's treating physicians, inquiring about her prognosis and treatment plan. In each clarification, the doctors responded that Ms. Bracey was continuing to be symptomatic, that she needed unlimited, unrestricted access to the restroom at work until symptoms resolved, and that Ms. Bracey was likely to have full capacity to return to her former position, but it was undetermined how long the restrictions would be needed. Ms. Bracey asserts that IDSC told her repeatedly that she could not return to work unless she could return without restrictions. However, in her briefing, she references Bates-numbered exhibits that are not present in the record, and the documents upon which she apparently relies are not searchable.

On July 2, 2013, Ms. Bracey sent a letter to her employer attempting to clear up any misunderstanding about her condition. She recapitulated her employer's position that "[she] can not return until [her] disability is completely cured and will not affect [her] in the future." But she asked for an interactive plan that would allow her to return to work and proposed using her lunch time and scheduled breaks to accommodate her disability. On August 15, 2013, Ms. Bracey wrote to Cheryl Dawson, a long-term disability case manager, asserting that she was not voluntarily resigning from her position, reiterating that she had repeatedly asked for accommodations, and asked for a clarification of terms for her to return to work. On August 20, 2013, a return-to-work specialist approved Ms. Bracey to return to work with the restriction that she required unscheduled, immediate access to a restroom. On the same day, Ms. Bracey sent a letter to Michigan Bell stating she

-5-

"remain[s] ready, able and willing to return to work at [Michigan Bell] working with [her] restrictions."

Ms Bracey contends that her health only got worse with the stress of uncertainty regarding her employment situation, and she desired to return to work. On September 20, 2013, she sent a letter to Pearlanne Pollard, the new Port Huron Center sales manager, explaining that she was ready to return to work and that she only needed accommodations when her condition was uncontrolled. She stated that with medication and regular care, she would not require any more bathroom breaks than the usual person. Ms. Bracey further requested, if the defendant refused to return her to her former position, that she be provided with a list of open positions that she could perform with her accommodation.

Shortly thereafter, the defendant sent a letter to Dr. Bassam Naar, another physician who treated the plaintiff for her digestive ailments, asking if Ms. Bracey's condition was currently under control. Dr. Naar's check-off response was that the plaintiff's condition was not controlled and she still required access to a restroom. On January 3, 2014, Ms. Pollard informed Ms. Bracey that Bracey was not able to perform the essential functions of her position with or without reasonable accommodations and that she would be placed on a job search list for 90 days. The plaintiff was told that if her job search was unsuccessful, she would be terminated at the end of the period.

According to sales manager Sean (Brister) Dupree, when a person needed an accommodation at the Port Huron call center, an employee customarily would be allowed to "break up their 15-minute breaks and lunch into smaller increments to accommodate them." Attendance manager Tracy Glenn testified that it would have been very easy to move Ms. Bracey's cubicle closer to the restroom, making it within a few seconds walk from her work station. But on May 7, 2012, Dupree

-6-

was notified that Ms. Bracey's accommodation was denied.  Dupree spoke with a return-to-work specialist and offered an accommodation of breaking up Ms. Bracey's two 15-minute breaks, which would be the equivalent of 5 minutes every hour.  The modification was denied and Ms. Dupree sustained the denial of accommodations.

Tracy Glenn conceded that in addition to Ms. Bracey's scheduled breaks, it was possible to allow "an additional 30 minutes for [Ms. Bracey] to use the restroom."  Also, assuming the union contract allowed, "it [wa]s possible for [Ms. Bracey] to have 90 unscheduled minutes throughout the day."  Glenn testified that a CPS can close a line by pressing the yellow button and take a break without getting permission from a coach.  She also explained that Michigan Bell has a transitional return-to-work program that allows employees returning from disability leave to return to work gradually with work shifts of 4, 6, or 8 hours.  The purpose of the program is to get employees back to full duty.

However, Glenn explained that Ms. Bracey's accommodation was denied because Michigan Bell believed her needs were unpredictable.  Ms. Bracey herself testified that she explained to her employer that "it's not like instant, run right now. It's not like that. . . . I can still hold it.  It's just that I need to — I do need to be able to go."  Ms. Bracey insists that she can delay her need to use the restroom for "10 minutes, 15," sometimes longer "[i]t depends how bad, if it's just a light flare-up.  [She] just need[s] to have [her] break unscheduled so [she] can go at that time" without affecting her customer service.  Ms. Bracey contends that her condition was not unpredictable;  it usually began with a "kind of rumble" and she would feel her stomach cramp, which alerted her that she would need to use the restroom at some point.  Ms. Bracey testified: "I've never hung up a customer before.  I've had this since 2007.  It's 2013.  I've had the same disease and I've not lost

a single customer. I've not hung up on a customer. I've not dropped a call. And I've had the same exact disease." Michigan Bell, however, believed that Ms. Bracey's restriction was a permanent and immediate need to use the restroom. The defendant fired Ms. Bracey on April 11, 2014.

The plaintiff filed her complaint in this Court on May 30, 2014, raising a single count that alleged three separate claims under the ADA: (1) failure to accommodate Ms. Bracey's disability; (2) failure to make an individualized inquiry and properly engage in the interactive process; and (3) wrongful termination. After a period of thorough and extensive discovery, the defendant filed its motion for summary judgment. The Court heard oral argument on November 10, 2015.

## II.

Defendant Michigan Bell Telephone Company seeks summary judgment on each of the plaintiff's theories supporting her claim under the Americans with Disabilities Act. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." 576 F.3d at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs,

the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

Congress enacted the Americans with Disabilities Act in an effort to "eliminate[] discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The Act prohibits

-9-

qualifying employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . hiring, advancement, or discharge, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). One act of discrimination prohibited by the ADA consists of "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C.A. § 12112 (b)(5)(A); *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).

A person is "qualified" for employment if she, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). It is up to the employee to request an accommodation from the employer; the accommodation must be "reasonable." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010). Once that proposal is made, the employer is obliged to interact with the employee to conduct an individualized assessment of the employee's disability to determine if the proposed accommodation will allow the employee to perform the essential functions of the job. *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)); *see also Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013) ("A proper evaluation involves consideration of the applicant's personal characteristics, h[er] actual medical condition, and the effect, if any, the condition may have on h[er] ability to perform the job in question."). The employer is not required to offer an accommodation to an employee who is not "qualified," or an accommodation that "would impose an undue hardship" on the employer's business operation. 42 U.S.C. § 12112(b)(5)(A).

-10-

The plaintiff alleges that Michigan Bell violated the ADA in three ways: (1) not allowing her a reasonable accommodation to have unscheduled breaks to use the restroom when her colitis or IBS causes a need to do so; (2) failing to engage in an interactive process in good faith to determine the precise nature of her limitations and the details of the accommodation she proposed; and (3) firing her because of her disability.  The defendant argues that the undisputed facts show that the plaintiff was not qualified for the CPS position because she could not attend to her call station duties at the required times, and the accommodation she proposed would impose an undue hardship on the defendant's business.

### A.  Denial of Reasonable Accommodation

A plaintiff must prove five elements to sustain a claim for violating the ADA by denial of a reasonable accommodation.  She must show that (1) she is "disabled," as the ADA defines the term; (2) she is otherwise qualified for the position, with or without a reasonable accommodation; (3) her employer knew or had reason to know of her disability; (4) she requested a reasonable accommodation; and (5) the employer did not provide the accommodation.  *Aldini v. Kroger Co. of Michigan*, --- F. App'x ---, 2015 WL 5827559, at *2 (6th Cir. Oct. 7, 2015) (citing *Johnson v. Cleveland City Sch. Dist.,* 443 F. App'x 974, 982-83 (6th Cir. 2011).  Michigan Bell does not dispute that the plaintiff offered evidence on elements one, three, and five, but it contends that proofs are wanting on the second and fourth elements.

The second and fourth elements of this claim are interrelated, because the plaintiff contends that she is qualified to perform the job of a CPS with the accommodation she requested, which, she contends, was reasonable.  To withstand summary judgment, Bracey must offer some evidence that "a 'reasonable' accommodation is possible," and that "she is qualified for the position with such

-11-

reasonable accommodation." *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 728 (6th Cir. 2000) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 n.2 (6th Cir. 1996) *abrogated by on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012)).

Michigan Bell argues that Bracey was not qualified for the CPS position because her disability would take her away from her work station at unpredictable times, and the proposed accommodation would prevent her from executing her duties.   Michigan Bell interprets the plaintiff's accommodation request to require unscheduled and frequent bathroom breaks of up to 10 to 12 times per shift of 10 to 15 minutes each, which would amount to 100 to 180 minutes.   Such an accommodation would require Ms. Bracey to terminate calls or transfer customers to other employees who would have to start the calls over, or put the customers on hold for extended periods in order to use the bathroom when the urgent need arose. That would prevent Bracey from satisfying the key requirement of her position, the defendant argues, which is handling customer calls to completion.

The defendant argues that the accommodation request is not reasonable, because if Bracey availed herself of that accommodation each day, every day, she would be away from her duties for at least one hour and 40 minutes and as much as three hours during an eight-hour shift.   Michigan Bell characterizes Bracey's request as a request for part-time work, but no such position existed at the Port Huron Call Center.   Bracey argues that she can easily perform the essential job functions with the reasonable accommodation of taking unscheduled bathroom breaks when needed.   She believed that she only needed to use a restroom 10-12 times *per day* (not per work shift, as the defendant viewed the request), and only when her condition is flaring up.   There is evidence to support both positions.

-12-

On March 21, 2012, Deborah Harries, a short-term disability specialist, received a clarification from Dr. Tumma stating Bracey's recommended restrictions were permanent. However, the permanent aspect of that clarification does not appear to have ever been communicated to the Port Huron decision makers, and the vast majority of the physician clarifications state the duration of the restrictions as undetermined or until symptoms lessen.

Bracey also says that the evidence shows that she can perform the essential functions of her position — fielding customer calls and handling them to completion — because she has done so since 2007, and has never had an accident at work, dropped a call, or hung up on a customer. Bracey contends that she simply needs unscheduled breaks and argues that such breaks will not disrupt the business of the call center.

Tara Bland, a physician's assistant who treated the plaintiff under the supervision of Dr. Tumma, testified that even during the colitis flare-up the plaintiff experienced in 2013 and 2014, Bracey never experienced fecal incontinence. She never had an "accident," although Bland could not say how long the plaintiff could delay her need to use the bathroom. Nonetheless, a fact-finder reasonably could conclude that Michigan Bell has the ability accommodate Bracey without undue hardship by providing unscheduled breaks at little or no inconvenience to the call center. The call desks are equipped with a yellow button that Bracey can press to close the line without permission from a supervisor and initiate an unscheduled break. And she has offered evidence that when she is not having a flare-up, she will not need any accommodation. When she is having a flare-up, she will need her current breaks and lunch period, but at unscheduled times, perhaps broken up into smaller amounts of time, as the defendant traditionally has allowed with other employees. In the event that she needs more time, the Michigan Bell system can easily account for the additional

breaks, and the plaintiff could make up any lost time before or after her regularly scheduled shift, as was offered to the plaintiff in *Spiteri v. AT & T Holdings, Inc.*, 40 F. Supp. 3d 869, 878 (E.D. Mich. 2014).

Furthermore, the impact of unscheduled bathroom breaks could be reduced by locating Ms. Bracey's cubicle next to the restroom, which Ms. Glenn said could be done easily. It appears that one of the defendant's main concerns is that Bracey would have to hang up on a customer. Bracey insists that she could perform her job without that occurring, a claim that the defendant relegates to speculation. However, the evidence on that point — Bracey's hang-up-free record as a CPS over a number of years during which she also suffered from her present condition — suggests that it is the defendant who relied on speculation when considering and rejecting Bracey's accommodation.

The record certainly contains contrary evidence, including Bracey's statements to the Social Security Administration describing her condition. The administrative law judge found those statements to be not fully credible, based in part on the evidence from physicians that characterized Bracey's condition as much less severe. At a minimum, however, the question is fact-bound, precluding summary judgment on this claim.

### B. Failure to Engage in Interactive Process

The ADA's regulations indicate that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." 29 C.F.R. § 1630.2(*o*)(3). The purpose of that process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Ibid.* The Sixth Circuit has explained that "[e]ven though the interactive process is not described in the statute's text, the interactive process

is mandatory, and both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871 (footnote and citations omitted).

The plaintiff alleges that the defendant breached that duty. To recover under that theory, Bracey must show that she proposed a reasonable accommodation and would have been reasonably accommodated but for Michigan Bell's refusal to participate in good faith. *Johnson*, 443 F. App'x at 987 n.19. Bracey has satisfied part of that burden, because, as noted above, she offered evidence from which a jury could find that she was qualified and proposed a reasonable accommodation. Michigan Bell also argues, however, that the plaintiff has not shown that its response was inadequate.

"In order to properly evaluate a job applicant on the basis of h[er] personal characteristics, the employer must conduct an individualized inquiry into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question." *Holiday*, 206 F.3d at 643. The Supreme Court has "made clear that such an individualized determination — one which focuses on the medical condition's actual effect on the specific plaintiff — lies at the heart of the ADA." *Ibid.* (citing *Sutton*, 527 U.S. 471). "This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Ibid.* "Both parties must participate in this process and do so in good faith." *Jakubowski*, 627 F.3d at 202 (citing *Kleiber*, 485 F.3d at 871). "Parties should not obstruct the process, or refuse to participate." *Id.* at 203.

Bracey contends that Michigan Bell did not interact with her in good faith because the people who ultimately decided to deny her accommodations had no knowledge of her actual condition. And when they did learn the details of her condition, they failed to take into account the actual effect of

-15-

her medical condition on her position.  Record evidence supports that argument.  Michigan Bell's disability claims and requests for accommodation are administered by IDSC, a third-party vendor. Bracey conveyed her conditions to a number of physicians, who in turn made accommodation recommendations to a number of different people at IDSC, who in turn conveyed their interpretation of the recommendations to a number of people at the Port Huron call center.  Once the request reached the call center, several people conveyed the accommodation proposal to each other, and finally one of the decision makers denied the accommodation based upon her understanding of the request.  But the last person in that chain did not compare her understanding to the original accommodation proposal, because Bracey was not included in the discussions about her accommodations.

The problem with that system is the sharp disconnect between those who know what an employee's disability is and those who would know how that disability would affect a given position.  Doctors made the accommodation recommendations to IDSC, but IDSC conveyed the requested accommodation, and not the condition, to Bracey's supervisors.  The supervisors are in the best position to consider how essential job functions can be preserved while still accommodating an employee's disability.  However, the supervisors were required to evaluate the accommodation request without understanding why the accommodation was needed, which is information necessary to assist them in making a proper evaluation.  A jury could conclude that the process was not "interactive," because it left the employee out of the loop.

A jury could find that Michigan Bell did not act in good faith because it obstructed the interactive process by not engaging with Bracey to resolve her need for an accommodation.  Both parties must participate in the process, but Michigan Bell established a complicated procedure that

-16-

compartmentalized the accommodation process and excluded the very individual it was designed to serve.  The record shows that Bracey sent several letters attempting to clarify her accommodation request, which either were not responded to or not considered in making the decision to deny her request.  Bracey continued to show up in person at the Port Huron call center in an attempt to engage with her supervisors, but she was not allowed to explain her position until it was too late to change the course of the accommodation denial.  The only Michigan Bell  representatives with which she regularly communicated were from IDSC, who did not have the authority to grant her accommodation, and did not know the specifics of her position with Michigan Bell.

Therefore, fact issues preclude summary judgment on this theory of liability.

### C.  Wrongful Termination

The defendant argues that the plaintiff may not prevail on this theory because it was not presented to the EEOC, and in any event, the plaintiff's termination did not violate the ADA because Bracey has not shown that she was qualified for the position.

### 1.  Exhaustion of Administrative Remedies

It is well established that if an employee suffers discrimination because she has a disability as defined by the ADA, 42 U.S.C. § 12102(1), the employee may bring an action seeking various remedies, including damages, provided that the employee first files a timely complaint with the EEOC.  42 U.S.C. §§ 12117, 2000e-5(f)(1).  *See Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 309 (6th Cir. 2000).  Michigan Bell argues that the plaintiff failed to exhaust administrative remedies on her wrongful termination claim because, although she filed a complaint with the EEOC concerning the alleged failure to accommodate her disability, the charge was dismissed and she received her right-to-sue letter on March 6, 2014, but she was not actually fired

-17-

until April 11, 2014. Bracey responds that she did not have to file a new EEOC charge, because her termination was a continuing violation of her ongoing wrongful denial of reasonable accommodations. Citing *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 155-56 (2d Cir. 2012), she contends that the "continuing violation doctrine" excuses the need for further exhaustion.

The "continuing violation doctrine" applies to filings that otherwise might be barred by a statute of limitations. It "operates to toll a limitations period when an employer's conduct 'represent[s] an ongoing unlawful employment practice.'" *Pittman v. Spectrum Health Sys.*, 612 F. App'x 810, 813 (6th Cir. 2015) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 107 (2002)); *see also Bowerman v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local No. 12*, 646 F.3d 360, 366 (6th Cir. 2011) (applying the doctrine "'where the plaintiff can show a longstanding and demonstrable policy of discrimination'" (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003))). That doctrine plays no part in determining whether a claim had been administratively exhausted. *Delisle v. Brimfield Twp. Police Dep't*, 94 F. App'x 247, 252-53 (6th Cir. 2004) (citations omitted).

The Sixth Circuit has held that exhaustion is a condition precedent to filing suit, not a limitation on a federal court's jurisdiction over ADA claims. *Parry*, 236 F.3d at 309 (citing *Rivers v. Barberton Bd. of Educ.*, 143 F.3d 1029, 1032 (6th Cir. 1998)). However, there is a clear requirement that claimant explicitly set forth the claim in the EEOC charge, or the claim must "reasonably be expected to grow out of the EEOC charge." *Jones v. Sumser Retirement Vill.*, 209 F.3d 851, 853 (6th Cir. 2000) (internal quotation marks omitted).

Bracey filed her charge with the EEOC without counsel on June 28, 2013, alleging the following:

-18-

I began working for [Michigan Bell]. My current title is Customer Specialist. I am an individual covered under the American with Disabilities Act of 1990, as amended.

I have been placed on Medical leave since March 1, 2013. I reported my condition to my employer in 2012 and requested an accommodation. I have been denied a reasonable accommodation and told that I could only return without any restrictions. I remain on medical leave, although I have requested to return to work.

I believe that I have been denied a reasonable accommodation based on my condition, in violation of the American with Disabilities Act of 1990, as amended.

The question presented by this statement is whether the wrongful termination claim in the context of this case can "reasonably be expected to grow out of the EEOC charge" that Bracey filed. *Jones*, 209 F.3d at 853.

The thrust of Bracey's EEOC charge is that Michigan Bell would not let her return to work with her proposed accommodation. She was told, she alleged, that she could not return to work at all unless she was restriction-free. The failure to accommodate, and the demand that Bracey eliminate restrictions — which her condition presumably required — led inevitably to her termination. The reverse may not have been true: a failure to accommodate claim may not necessarily emerge from a wrongful termination claim. *See Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 813 (7th Cir. 2014). But that is not the case here. The termination flowed naturally from the course of events that the EEOC necessarily would have investigated when presented with Bracey's administrative complaint. That complaint, therefore, satisfies the exhaustion requirement of 42 U.S.C. §§ 12117 and 2000e-5(f)(1). *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998) (stating that "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim").

-19-

### 2.  Merits of the Claim

Michigan Bell argues that the wrongful termination count should be dismissed as a matter of law because the plaintiff has not established a *prima facie* case for discrimination under the ADA. In so arguing, the defendant makes an oblique reference to the burden-shifting protocol used in most employment cases where proof of discriminatory motivation is based on circumstantial evidence. *See  Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)).  However, the plaintiff relies on direct evidence of discrimination, based on the undisputed fact that the plaintiff was terminated from her CPS job because the defendant believed that she could not attend to her duties without interruption.

In direct evidence cases, "there is no need for a *McDonnell Douglas* type burden shift and traditional burdens of proof will apply."  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).  Instead, "[t]o recover on a claim of discrimination under the [ADA], a plaintiff must show that: 1) [s]he is an individual with a disability; 2) [s]he is 'otherwise qualified' to perform the job requirements, with or without reasonable accommodation; and 3) [s]he was discharged solely by reason of his handicap."  *Id.* at 1178.  Since this formulation of the test, the Sixth Circuit has recognized that the disability need not be the *sole* reason for the adverse action, although the plaintiff must establish that her employer acted "because of" her disability, that is, "but for" causation.  *Lewis*, 681 F.3d at 318 (citing *Gross v. FBL Financial Services*, 557 U.S. 167, 177-78 (2009).

That standard is easily satisfied here.  Michigan Bell gave no reason for the plaintiff's termination other than her disability.  The defendant does not argue otherwise.  Instead, it contends

-20-

that the plaintiff was not "otherwise qualified" to perform the essential functions of her CPS job. But, for the reasons discussed above, a fact question exists on that point, which precludes summary judgment for the defendant.

<div align="center">III.</div>

The plaintiff exhausted her administrative remedies on her wrongful termination claim. Material fact questions preclude summary judgment for the defendant on all three of the plaintiff's theories of liability.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. #24] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   December 24, 2015

<div style="border: 1px solid black; background: #ccc; padding: 10px; width: 50%; margin: auto;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 24, 2015.

S/Susan Pinkowski
SUSAN PINKOWSKI

</div>